**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Susan M. Justice, | : | Case No. 1:12 CV 1541 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Susan M. Justice ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 16 and 19). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner be affirmed.

1

## II. PROCEDURAL BACKGROUND

On November 12, 2010, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 14, p. 203 of 630). On November 24, 2010, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 14, p. 206 of 630). In both applications, Plaintiff alleged a period of disability beginning November 5, 2010 (Docket No. 14, pp. 203, 206 of 630). Plaintiff's claims were denied initially on April 25, 2011 (Docket No. 14, pp. 151, 155 of 630), and upon reconsideration on August 9, 2011 (Docket No. 14, pp. 163, 170 of 630). Plaintiff thereafter filed a timely written request for a hearing on August 19, 2011 (Docket No. 14, p. 177 of 630).

On January 10, 2012, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Frederick Andreas ("ALJ Andreas") (Docket No. 14, pp. 26-70 of 630). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 14, p. 28 of 630). ALJ Andreas found Plaintiff to have a severe combination of carpal tunnel syndrome, cervical and lumbar disc disease, and depression with an onset date of November 5, 2010 (Docket No. 14, p. 16 of 630).

Despite these limitations, ALJ Andreas determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 14, p. 19 of 630). ALJ Andreas found Plaintiff had the residual functional capacity to perform light work with the following exceptions:

1.   Plaintiff is limited to only occasional overhead reaching

2.   Plaintiff can relate to others only on a superficial level

3.   Plaintiff is limited to routine tasks in a static environment

(Docket No. 14, p. 17 of 630). The ALJ found Plaintiff able to perform her past relevant work as a

cafeteria worker and a cashier (Docket No. 14, p. 19 of 630). Plaintiff's request for benefits was therefore denied (Docket No. 14, p. 19 of 630).

On June 15, 2012, Plaintiff, *pro se*, filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged: (1) the ALJ failed to reasonably account for all of her impairment-related limitations by finding that Plaintiff was capable of light work; and (2) the evidence submitted to the Appeals Council after the ALJ's decision warrants a remand under sentence six of 42 U.S.C. § 405(g) (Docket No. 16). Defendant filed its Answer on January 25, 2013 (Docket No. 19).

### III.  FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on January 10, 2012, in Cleveland, Ohio (Docket No. 14, p. 28 of 630). Plaintiff, represented by counsel Carl McMahon, appeared and testified (Docket No. 14, pp. 28-60 of 630). Also present and testifying was VE Nancy Borgeson ("VE Borgeson") (Docket No. 14, pp. 60-70 of 630).

##### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was residing with her mother after leaving her husband sometime in 2010 (Docket No. 14, p. 34 of 630). Plaintiff testified that she has an eighth grade education but completed her GED in 1986 (Docket No. 14, p. 35 of 630). Plaintiff also indicated that she published an autobiography, which was not selling (Docket No. 14, pp. 35-36 of 630). Plaintiff testified that she last worked in November 2010, and believes that she is unable to work because of her fibromyalgia, depression, and chronic fatigue (Docket No. 14, pp. 39-40 of 630). Plaintiff stated that she has a driver's license and is able to drive (Docket No. 14, p. 34 of 630).

Plaintiff last worked at DeLuca's Place in the Park ("DeLuca's") in Lorain, Ohio, in both the café and catering divisions (Docket No. 14, pp. 36-37 of 630). She claimed to work twenty-five to forty hours per week for eight dollars an hour (Docket No. 14, pp. 36-37 of 630). She testified that she left this job because it was too physically demanding and she was becoming exhausted (Docket No. 14, p. 37 of 630). Prior to this job, Plaintiff worked for Convenient Food Mart and for Aeromark Educational Services as a cafeteria worker (Docket No. 14, p. 38 of 630). Plaintiff's last day on the job was November 11, 2010 (Docket No. 14, p. 39 of 630).

Plaintiff gave testimony concerning a number of her alleged impairments, including her sleep apnea, neck and back pain, carpal tunnel syndrome, depression, and fibromyalgia (Docket No. 14, pp. 33-60 of 630). She also described her history of drug and alcohol abuse, claiming that she last used illegal drugs at least eight years prior to the hearing (Docket No. 14, pp. 49-50 of 630). Plaintiff stated that she was once dependant on crack cocaine and voluntarily checked herself into a rehabilitation facility in 1992 (Docket No. 14, p. 50 of 630). She acknowledged a few relapses over the years, but alleged that last incident was in 1995 or 1996 (Docket No. 14, p. 50 of 630). Plaintiff also indicated that she attended Alcoholics Anonymous ("AA") meetings for three to four years beginning in 1992 (Docket No. 14, p. 50 of 630). Plaintiff also testified that she was arrested in 2006 for purchasing drugs allegedly for a friend (Docket No. 14, p. 51 of 630). According to Plaintiff, there was no conviction and this record was expunged (Docket No. 14, p. 51 of 630).

With regard to her sleep apnea, Plaintiff indicated that she sleeps with a Continuous Positive Airway Pressure ("CPAP") machine every night (Docket No. 14, pp. 51-52 of 630). Plaintiff claims that the machine does not eliminate her symptoms, and she often gets sleepy by mid-afternoon and takes a nap for three to four hours at least four times per week (Docket No. 14, p. 52 of 630). When

4

asked about her neck and back pain, Plaintiff indicated that her back will "go out" and claimed that she had been told she has arthritis and degenerative disc disease in her lower back (Docket No. 14, p. 53 of 630). Plaintiff also stated that her neck pain causes numbness extending down her right arm (Docket No. 14, p. 53 of 630). With regard to her carpal tunnel, Plaintiff stated that she has a difficult time gripping things and must wear splints at night (Docket No. 14, p. 54 of 630).

Most of Plaintiff's testimony concerned her fibromyalgia, which she claimed leaves her in constant pain (Docket No. 14, pp. 41-42 of 630). Plaintiff testified that she experiences at least ten "flares" per month which increase her pain (Docket No. 14, pp. 41-42 of 630). When asked what she does during these flares, Plaintiff stated that she "lay[s] in bed and cr[ies]" and tries to stretch (Docket No. 14, p. 42 of 630). Plaintiff stated that she was sent to physical therapy but only went once because it about "killed" her (Docket No. 14, p. 40 of 630). However, she later stated that she did do physical therapy and traction at home for her neck pain (Docket No. 14, p. 43 of 630). Plaintiff testified that she re-started physical therapy approximately four weeks before the hearing (Docket No. 14, p. 43 of 630). Plaintiff also indicated that she was on a variety of medications, including Naproxen, Flexeril, Ativan, Xanax, and Percocet, which help to reduce the pain (Docket No. 14, p. 40 of 630).

With regard to her depression, Plaintiff stated that she no longer has the ambition to do anything (Docket No. 14, p. 47 of 630). At the time of the hearing, she stated that she was in counseling at the Nord Center, and previously attended North Coast for counseling services (Docket No. 14, p. 48 of 630).

When asked about her daily activities, Plaintiff indicated that she wakes up, makes coffee, watches movies, eats breakfast, spends time on the computer, cooks for her mother, and sometimes goes to the grocery store (Docket No. 14, pp. 48-49 of 630). Plaintiff also testified that she visits with

5

her grandchildren every other weekend and goes to church (Docket No. 14, pp. 48, 59 of 630).

Plaintiff also testified as to her residual functional capacity. She indicated that she can walk for twenty minutes at a time and stand for an hour before needing to sit (Docket No. 14, p. 44-45 of 630). She can also sit for thirty minutes before needing to move (Docket No. 14, p. 45 of 630). Plaintiff stated that she has a hard time gripping things, but indicated that she can button her shirt, carry a half-filled coffeepot, and lift grocery bags (Docket No. 14, pp. 45-46 of 630).

## 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a cashier as light and unskilled, a waitress as light and low-level semi-skilled, a cashier wrapper as light and low-level semi-skilled, and a cafeteria worker as light and low-level semi-skilled (Docket No. 14, p. 62 of 630). VE Borgeson also stated that, because Plaintiff's responsibilities at DeLuca's required her to lift up to fifty pounds, some of those duties were performed at a medium level (Docket No. 14, p. 62 of 630). The ALJ then posed his first hypothetical question:

> . . . the person would be able to lift and carry, push or pull, 50-pounds occasionally, 25-pounds frequently. Would be able to stand and walk for six-hours, would be able to sit for six-hours in an eight-hour workday all with normal breaks. Additionally, that person would have occasional overhead reaching and frequent gross manipulation due to the neck issues and, perhaps, the carpal tunnel. That person retains the ability to carry out simple to complex work tasks with limited production standards. She retains the ability to relate to others on a superficial level as needed. Despite reduced stress tolerance, that person retains the ability to perform routine tasks in a static work environment . . . And, when I think of static, I am thinking of work changes are only occasional . . . would that person be able to do any of the claimant's past work?

(Docket No. 14, p. 64 of 630). Taking into account these limitations, the VE testified that such an individual would be able to perform Plaintiff's past work as a cafeteria worker or cashier (Docket No. 14, p. 64 of 630).

ALJ Andreas then posed his second hypothetical question:

. . . if that person, for the second hypothetical, was able to perform light work, once again, could have occasional overhead reaching, and frequent gross manipulation, that person would be able to carry out simple to complex work tasks with limited protection standards, retains the ability to relate to others on a superficial level as needed and has reduced stress tolerances, but retains the ability to perform routine tasks in a static work setting, would that person be able to perform any of [Plaintiff's] past work?

(Docket No. 14, p. 65 of 630). The VE indicated that the hypothetical person would be able to perform Plaintiff's past work as a cashier and a cafeteria worker (Docket No. 14, p. 65 of 630). ALJ Andreas then questioned, "[i]f that person, at the light level, required a sit/stand option, would that change your answer" (Docket No. 14, p. 65 of 630). VE Borgeson indicated that the hypothetical claimant would not be able to perform the cafeteria worker job and only some cashier jobs (Docket No. 14, p. 65 of 630).

The VE also stated that this hypothetical claimant could perform other work at the light level including: (1) cashier II, listed under DOT 211.462-010, for which there are 1,000,000 positions nationally and 50,000 in the State of Ohio;[1] (2) mail clerk (outside of the post office), listed under DOT 209.687-026, for which there are 139,000 positions nationally and 7,000 in the State of Ohio; and (3) bend assembler, listed under DOT 706.684-022, for which there are 289,000 positions nationally and 35,000 in the State of Ohio (Docket No. 14, p. 66 of 630).

During cross-examination, Plaintiff's counsel added to the ALJ's second hypothetical, questioning "[i]f the hypothetical person were to miss time from work . . . because of health reasons, and they would miss one to two days a week, would they still be able to do the jobs that you have described" (Docket No. 14, p. 67 of 630). The VE indicated that, with this limitation, the hypothetical

---

[1] VE Borgeson indicated that she would reduce the number of jobs available for this position by fifty percent, given the sit/stand option (Docket No. 14, p. 66 of 630).

person would not be able to sustain those jobs (Docket No. 14, p. 67 of 630). VE Borgeson went on to testify that most private sector employers would accept a total of six to eight employee absences per year (Docket No. 14, p. 68 of 630). Counsel then added another limitation to the ALJ's second hypothetical, questioning "if the person was off-task, maybe 15 percent of the time per day due to various health problems, would they still be able to hold those jobs of bench assembler, mail clerk, or cafeteria or cashier worker" (Docket No. 14, pp. 68-69 of 630). The VE responded in the negative (Docket No. 14, p. 69 of 630).

**B.    MEDICAL RECORDS**

**1.    PHYSICAL HEALTH ISSUES**

Plaintiff's medical records dealing with her physical impairments date back to February 9, 2007, when Plaintiff underwent radiology testing of her chest and lumbar spine (Docket No. 14, p. 390 of 630). Plaintiff's chest exam was normal, showing no acute cardiac or pulmonary disease (Docket No. 14, p. 390 of 630). Testing of Plaintiff's lumbar spine showed mild disc space reduction of the L5-S1 vertebrae, mild end plate sclerosis with early osteophyte formation at the L4 vertebrae, but no spondylolysis or spondylolisthesis (Docket No. 14, p. 390 of 630). Plaintiff was diagnosed with only mild arthritic changes (Docket No. 14, p. 390 of 630).

Two years elapsed before Plaintiff had further medical testing. On February 16, 2009,  Plaintiff underwent radiology testing of her cervical spine (Docket No. 14, pp. 456, 508, 509 of 630). The results were unremarkable (Docket No. 14, pp. 456, 508, 509 of 630). On April 14, 2009, Plaintiff had an x-ray of her left shoulder, which yielded normal results (Docket No. 14, p. 507 of 630). On May 5, 2009, Dr. Armstrong Murphy, MD ("Dr. Murphy") conducted an electrodiagnostic study, which revealed evidence of mild carpal tunnel syndrome in Plaintiff's left hand (Docket No. 14, pp. 453, 503

8

of 630). Plaintiff was given night splints (Docket No. 14, pp. 453, 503 of 630).

On May 18, 2009, Plaintiff was seen by Dr. Santhosh Thomas, DO ("Dr. Thomas") for a consultive examination at the request of Dr. George K. Adams, DO ("Dr. Adams"), Plaintiff's treating physician (Docket No. 14, pp. 458-64, 510-17 of 630). Plaintiff presented with chronic lower back pain, which she described as a burning, shooting, sharp pain (Docket No. 14, pp. 458, 510 of 630). At the time of her examination, Plaintiff rated her pain at level zero out of a possible ten, but stated that her pain could sometimes increase to level ten (Docket No. 14, pp. 458, 510 of 630). Plaintiff claimed that her pain was exacerbated by activity and alleviated with rest, and she denied any parasthesias or weakness, although she did report a subjective weakness of her lower extremities (Docket No. 14, pp. 458-59, 510-11 of 630). Upon examination, Plaintiff had no tenderness over her paraspinal muscles or tenderness on percussion of her spinous processes (Docket No. 14, pp. 459, 511 of 630). She did have some decreased internal rotation in her left shoulder (Docket No. 14, pp. 459, 511 of 630). Dr. Thomas reported that Plaintiff had: (1) small, uncovertebral joint osteophytes at the C4-5, C5-6 and C6-7 vertebrae without disc narrowing; (2) moderate degenerative disc disease at the L4-5 vertebrae; (3) small anterior endplate osteophytes at the L3-4 vertebrae; and (4) minimal degenerative facet changes and lower lumbar spine osteopenia (Docket No. 14, pp. 463-64, 516-17 of 630). Plaintiff was diagnosed with cervical disc degeneration, brachial neuritis not otherwise specified ("NOS"), lumbosacral spondylosis, and a backache NOS (Docket No. 14, pp. 460, 513 of 630).

On November 6, 2009, Plaintiff saw Dr. Adams for a maintenance examination (Docket No. 14, pp. 472, 569 of 630). At that time, Plaintiff indicated that she had not been taking her medications for three weeks and was doing "fairly well" without them (Docket No. 14, pp. 472, 569 of 630). Plaintiff also reported still smoking (Docket No. 14, pp. 472, 569 of 630). Dr. Adams treated Plaintiff

9

for high cholesterol and fibromyalgia (Docket No. 14, pp. 473, 570 of 630).

Plaintiff did not return to Dr. Adams for nearly one year, until October 7, 2010 (Docket No. 14, pp. 469, 566 of 630). During this October appointment, Plaintiff claimed to still be working fifty to sixty hours per week (Docket No. 14, pp. 469, 566 of 630). She reported struggling with emotional issues, fatigue, and fibromyalgia, and was still smoking at least one pack of cigarettes per day (Docket No. 14, pp. 469, 566 of 630). Plaintiff was treated for high cholesterol, mild depression, fibromyalgia, and anxiety (Docket No. 14, pp. 470, 567 of 630).

On December 14, 2010, Dr. Adams completed a survey at the request of the Bureau of Disability Determination ("BDD") and listed Plaintiff's ailments as follows: chronic pain, fibromyalgia, depression, back and spine issues, rotator cuff tendonitis, and carpal tunnel syndrome (Docket No. 14, pp. 467 of 630). Dr. Adams opined that Plaintiff was "significantly impaired" as a result of her multiple ailments (Docket No. 14, p. 468 of 630).

Plaintiff returned to Dr. Adams on February 21, 2011, complaining of daytime fatigue (Docket No. 14, p. 563 of 630). Plaintiff stated that she was not taking her medications due to financial constraints, but did indicate that she was using her CPAP machine (Docket No. 14, p. 563 of 630). Plaintiff was treated for fibromyalgia, high cholesterol, sleep apnea, tobacco use, and anxiety (Docket No. 14, p. 564 of 630).

On March 30, 2011, Plaintiff underwent a Manual Muscle Testing Evaluation with Dr. Marsha D. Cooper, MD ("Dr. Cooper") at the request of the BDD (Docket No. 14, pp. 526-32 of 630). Dr. Cooper noted that Plaintiff presented to the evaluation in an angry and hostile manner, seemingly upset over her ongoing divorce (Docket No. 14, pp. 530, 532 of 630). Plaintiff was otherwise very talkative and complained extensively about her sore, stiff muscles (Docket No. 14, p. 531 of 630). The overall

10

evaluation was normal (Docket No. 14, pp. 526-29 of 630). Dr. Cooper suggested that Plaintiff work a sedentary job (Docket No. 14, p. 532 of 630).

Plaintiff presented to the Amherst Hospital Emergency Room ("Amherst ER") on June 13, 2011, complaining of right shoulder pain that was radiating into her chest (Docket No. 14, p. 534 of 630). Plaintiff rated her level of pain as an eight (Docket No. 14, p. 534 of 630). Testing showed degenerative changes at Plaintiff's C5-6 vertebrae as well as lung hyperinflation that could reflect possible COPD (Docket No. 14, pp. 539, 541 of 630). Plaintiff was diagnosed with fibromyalgia and discharged (Docket No. 14, p. 546 of 630).

On August 3, 2011, Plaintiff saw Dr. Daniel J. Zanotti, MD ("Dr. Zanotti") complaining of right neck and shoulder pain that was radiating (Docket No. 14, p. 598 of 630). An examination showed that Plaintiff had a positive Spurling test[2] but full overhead motion of her shoulder with full strength and only very slight pain with stressing and impingement maneuvers (Docket No. 14, p. 598 of 630). Plaintiff also had full internal and external rotation of the shoulder (Docket No. 14, p. 598 of 630). Dr. Zanotti diagnosed Plaintiff with a right shoulder sprain/impingement and cervical degenerative disease with possible radiculopathy (Docket No. 14, p. 598 of 630).

On August 8, 2011, Dr. Adams sent Plaintiff for an MRI of her right shoulder, which revealed mild tendonopathy and/or a partial tear (Docket No. 14, p. 600 of 630). On September 2, 2011, Plaintiff underwent a cervical MRI, which revealed mild right neuroforaminalstenosis at the C3-4, C4-5, C5-6, and C6-7 vertebrae, and bilateral disc osteophyte complexes with disc herniation extending

---

[2] A Spurling test involves extending the patient's neck, moving the head to the affected side, and applying an axial load to the cervical spine to determine if symptoms of paresthesia or pain intensify. The maneuver is used in the physical assessment of patients with possible cervical nerve root compression. The test is not performed until the possibility of a cervical spine fracture or dislocation has been ruled out. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

into the right lateral recess at the C5-6 and C6-7 vertebrae (Docket No. 14, p. 599 of 630).

Plaintiff returned to Dr. Zanotti on September 12, 2011, complaining of continuing pain in her neck and spine which was radiating down her right arm (Docket No. 14, p. 597 of 630). Again Plaintiff had a positive Spurling test, but had full overhead motion and cuff strength (Docket No. 14, p. 597 of 630). Dr. Zanotti noted that Plaintiff had some pain with impingement maneuvers (Docket No. 14, p. 597 of 630). Based on her recent MRI, Dr. Zanotti opined that Plaintiff likely suffered from some bilateral neural foraminal stenosis with a questionable disc herniation at the C5-6 vertebrae (Docket No. 14, p. 597 of 630).

On October 26, 2011, Plaintiff saw neurologist Dr. Domingo Gonzalez, MD ("Dr. Gonzalez") complaining of cervical pain that was radiating into her right upper extremity (Docket No. 14, p. 625 of 630). Plaintiff also reported weakness on gripping with her right side and pains in the anterior portion of her right shoulder with occasional tingling (Docket No. 14, p. 625 of 630). An examination revealed some limitation of Plaintiff's cervical spine motion and some tenderness upon palpation on the anterior portion of her right shoulder (Docket No. 14, p. 625 of 630). Dr. Gonzalez also noted minimal atrophy of her right side, although Plaintiff's strength was normal for all of her extremities (Docket No. 14, p. 625 of 630). Plaintiff also had a weak Tinel sign[3] in her right wrist (Docket No. 14, p. 625 of 630). During the examination, Plaintiff reported still smoking one pack of cigarettes per day (Docket No. 14, p. 625 of 630). Dr. Gonzalez diagnosed Plaintiff with cervical radiculopathy in her right upper extremity from degenerative changes and a herniated disc at the C5-6 vertebrae (Docket No. 14, p. 626 of 630). He recommended conservative treatment (Docket No. 14, p. 626 of 630).

---

[3] A cutaneous tingling sensation produced by pressing on or tapping the nerve trunk that has been damaged or is regenerating following trauma. TABER'S MEDICAL CYCLOPEDIC DICTIONARY (2011).

2.    MENTAL HEALTH ISSUES

Plaintiff's mental health records date back to July 11, 2004, to an initial assessment at the Nord Center (Docket No. 14, p. 373 of 630). Plaintiff reported being depressed, anxious, and angry, with thoughts of worthlessness, helplessness, and hopelessness (Docket No. 14, p. 374 of 630). Nord Center staff assigned Plaintiff a Global Assessment of Functioning ("GAF") score of forty-eight[4] and Plaintiff was discharged (Docket No. 14, p. 376 of 630).

More than one year later, on December 17, 2005, Plaintiff called the Nord Center Crisis Intervention Unit claiming she "trashed" her home after finding out that her husband had been unfaithful (Docket No. 14, p. 369 of 630). Plaintiff was seen at the Center and reported no suicidal ideation but stated that she wanted to kill her husband (Docket No. 14, p. 370 of 630).[5] Plaintiff reported a past history with drugs, but claimed to have been clean for thirteen years (Docket No. 14, p. 371 of 630). Plaintiff reported using alcohol twice in the past month (Docket No. 14, p. 371 of 630). After an in-person assessment, Plaintiff was cleared and discharged home (Docket No. 14, p. 372 of 630).

Plaintiff returned to the Nord Center on September 1, 2011, complaining of depressed mood, crying spells, low energy, poor motivation, anxiety, feeling overwhelmed, poor sleeping habits, low to fair appetite, racing thoughts, and difficulty focusing (Docket No. 14, p. 615 of 630). Plaintiff appeared

---

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of forty-eight indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[5] Plaintiff later stated that the feeling of wanting to kill her husband had subsided because "it's not worth it" (Docket No. 14, p. 370 of 630).

13

motivated for counseling (Docket No. 14, p. 618 of 630).[6]

**C.  EVALUATIONS**

**1.  ADULT DIAGNOSTIC ASSESSMENT**

On October 11, 2006, Plaintiff underwent an Adult Diagnostic Assessment with Ben Miladin, LISW ("Mr. Miladin") (Docket No. 14, pp. 355-68 of 630). Plaintiff reported a history of sleeping on the streets as well as drug and alcohol use (Docket No. 14, pp. 355-56, 367 of 630). Plaintiff indicated that she was arrested in September 2006 for dealing drugs, but claimed that she was not using, just trying to make extra money (Docket No. 14, p. 355 of 630). She claimed she last used alcohol on August 15, 2006 (Docket No. 14, p. 367 of 630). Plaintiff also reported a history of physical and sexual abuse (Docket No. 14, p. 360 of 630). Mr. Miladin diagnosed Plaintiff with an adjustment disorder with depressed mood and polysubstance abuse in full sustained remission (Docket No. 14, p. 364 of 630). Plaintiff was assigned a GAF score of seventy[7] (Docket No. 14, p. 364 of 630).

**2.  PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT**

On May 29, 2008, Plaintiff underwent a Physical Residual Functional Capacity Assessment with Dr. Adams (Docket No. 14, p. 394 of 630). Dr. Adams reported that Plaintiff could: (1) stand/walk for 6.5-8 hours during an eight-hour workday; (2) sit for 5.5-8 hours during an eight-hour workday; (3) lift eleven to twenty pounds occasionally; (4) use hands for repetitive simple grasping, pushing/pulling, and fine manipulation; (5) use feet for repetitive movements in operating foot controls; (6) frequently bend and squat; (7) occasionally climb and push/pull; and (8) can never crawl

---

[6] Records also indicate that Plaintiff was seen at North Coast Counseling Services from December 7, 2010, through February 21, 2011 (Docket No. 14, p. 593 of 630). No detailed records were included in the transcript.

[7] A GAF score of seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning. DSM-IV at 34.

14

(Docket No. 14, p. 394 of 630).

### 3.   PSYCHIATRIC REVIEW TECHNIQUE

On September 10, 2008, Dr. Todd Finnerty, Psy.D. ("Dr. Finnerty") attempted to complete a Psychiatric Review Technique for Plaintiff (Docket No. 14, pp. 431-44 of 630). Dr. Finnerty noted that Plaintiff suffered from depression (Docket No. 14, p. 434 of 630). However, since Plaintiff missed the psychological examination and failed to respond to Dr. Finnerty's calls and letters, Dr. Finnerty was unable to evaluate Plaintiff's activities of daily living, social functioning, concentration, persistence, or pace, and any episodes of decompensation (Docket No. 14, p. 441 of 630).

### 4.   PSYCHOLOGICAL EVALUATION

On February 17, 2011, Plaintiff underwent a Psychological Evaluation with Dr. Ronald G. Smith ("Dr. Smith") at the request of the BDD (Docket No. 14, pp. 518-25 of 630). Plaintiff indicated that she dropped out of high school halfway through her ninth grade year and obtained her GED in 1985 (Docket No. 14, p. 519 of 630). Plaintiff reflected a feeling of having been victimized throughout her entire life and complained that she was physically and emotionally drained (Docket No. 14, pp. 520-21 of 630). When asked, Plaintiff listed her activities of daily living as making coffee, doing the dishes and laundry, preparing dinner, using the computer, and going to the store (Docket No. 14, p. 523 of 630). Plaintiff was fairly spontaneous in her speech, although sometimes wandered, was well oriented to time and place, and demonstrated fair judgment but poor insight (Docket No. 14, pp. 522-23 of 630). Dr. Smith also noted that Plaintiff seemed impulsive and likely to give up easily (Docket No. 14, p. 522 of 630).

Dr. Smith opined that Plaintiff was moderately impaired in her ability to: (1) relate to others; (2) maintain attention, concentration, and persistence; and (3) withstand the stress and pressure of day-

to-day work (Docket No. 14, p. 524 of 630). Plaintiff was not impaired in her ability to understand, remember, and follow instructions (Docket No. 14, p. 524 of 630). Dr. Smith diagnosed Plaintiff with a pain disorder associated with psychological factors, depressive disorder NOS, personality NOS, and assigned her a GAF score of fifty[8] (Docket No. 14, pp. 523-24 of 630).

### 5.    DIAGNOSTIC ASSESSMENT

On August 8, 2011, Plaintiff underwent a Diagnostic Assessment at the Nord Center (Docket No. 14, pp. 605-19 of 630). Plaintiff stated that she went to the Nord Center because she thought it would help aid in her efforts to obtain SSI (Docket No. 14, p. 605 of 630). Plaintiff's account of her symptoms and history was very similar to that given in her October 2006 Adult Diagnostic Assessment (Docket No. 14, pp. 605-19 of 630). Nord Center staff assigned Plaintiff a GAF score of fifty-eight[9] (Docket No. 14, p. 613 of 630).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

---

[8] A GAF score of fifty indicates serious symptoms or any serious impairment in social, occupation, or school functioning. DSM-IV at 34.

[9] A GAF score of fifty-eight indicates moderate symptoms or moderate difficulty in social, occupation, or school functioning. DSM-IV at 34.

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

17

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Andreas made the following findings:

1.     Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.

2.     Plaintiff has not engaged in substantial gainful activity since November 5, 2010, the alleged onset date.

3.     Plaintiff has the following severe impairments: carpal tunnel syndrome, cervical and lumbar disc disease, and depression.

4.     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.     Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she is limited to only occasional overhead reaching, can only relate to others on a superficial level, and is limited to doing routine tasks in a static environment.

6.     Plaintiff is capable of performing past relevant work as a cafeteria worker and as a cashier. These jobs do not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.     Plaintiff has not been under a disability from November 5, 2010, through the date of this decision.

18

(Docket No. 14, pp. 14-20 of 630). ALJ Andreas denied Plaintiff's request for DIB and SSI benefits (Docket No. 14, p. 19 of 630).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

Although not specifically stated, the Magistrate construes Plaintiff's arguments as follows: (1)

the ALJ's decision was not supported by substantial evidence; and (2) the recent opinion of Plaintiff's

treating physician, Dr. Adams, that Plaintiff is totally disabled warrants a remand (Docket No. 16).

**B.    DEFENDANT'S RESPONSE**

Defendant contends that: (1) the ALJ's decision is supported by substantial evidence; and (2)

Plaintiff's additional evidence does not warrant a remand (Docket No. 19).

**C.    DISCUSSION**

**1.    SUBSTANTIAL EVIDENCE**

As stated above, DIB and SSI are only available for those who have a "disability" as that term

is defined by Social Security regulations.  42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.

Plaintiff claims that her fibromyalgia, carpal tunnel, headaches, and depression, coupled with her

current financial state, make her eligible for disability benefits (Docket No. 16). The ALJ disagreed,

finding that although Plaintiff suffers from carpal tunnel syndrome, cervical and lumbar disc disease,

and depression, these impairments do not rise to the required level of severity (Docket No. 14, p. 16 of

630). While this Magistrate certainly tales note of Plaintiff's current financial state, the regulations are

clear: an individual will be found to be disabled if and only if, considering her age, education, work

experience, and residual functional capacity, her physical or mental impairments are of such severity

that she is not only unable to do any past relevant work, but also any *other* work which exists in the

national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). This determination must be based on

substantial evidence. 42 U.S.C. § 405(g). Once made, the decision of the Commissioner cannot be

disturbed absent his failure to apply the correct legal standard or base his decision on substantial

evidence. *McClanahan*, 474 F.3d at 832-33. Based on a review of Plaintiff's record, this Magistrate

finds that the ALJ's decision was based on substantial evidence and therefore recommends that the

20

decision of the Commissioner be affirmed.

Plaintiff alleges that a majority of her problems stem from a diagnosis of fibromyalgia (Docket No. 14, pp. 40-43 of 630). The Sixth Circuit has recognized fibromyalgia as a possible severe and disabling impairment. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). However, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Id.* (*citing Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Instead, "fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion." *Id.* at 243 (internal quotations omitted). "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Rogers*, 486 F.3d at 244 (*citing Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003)).

It is unclear from Plaintiff's medical records when, exactly, she was diagnosed with fibromyalgia. The diagnosis first appears in notes from Plaintiff's appointment with Dr. Adams on November 6, 2009 (Docket No. 14, pp. 472, 569 of 630). However, the record is void of any reference to a trigger point determination or any medical evidence that supports a diagnosis of fibromyalgia (Docket No. 14, pp. 354-630 of 630). There is also no indication that other possible conditions were ruled out through "objective medical and clinical trials" (Docket No. 14, pp. 354-630 of 630). The record only contains Plaintiff's subjective complaints of pain and chronic fatigue (Docket No. 14, pp. 40-43 of 630). There is simply no evidence establishing fibromyalgia as a severe impairment.

Plaintiff also alleges that she suffers from sleep apnea (Docket No. 16, p. 2 of 7). On February 21, 2011, Dr. Adams noted that Plaintiff suffered from daytime fatigue and required naps (Docket No. 14, p. 563 of 630). However, Plaintiff also indicated compliance with her CPAP machine (Docket No.

14, p. 52 of 630) and there is no mention in the balance of Plaintiff's medical record of an inability to work due to this daytime fatigue (Docket No. 14, pp. 354-630 of 630).

Plaintiff also complains of carpal tunnel syndrome (Docket No. 16, p. 2 of 7). She received a diagnosis of "mild left carpal tunnel syndrome" on May 5, 2009, following an electrodiagnostic study (Docket No. 14, pp. 453, 503 of 630). Plaintiff was given night splints as a means of controlling her symptoms (Docket No. 14, pp. 453, 503 of 630). Dr. Adams also mentioned this diagnosis in his December 14, 2010, report to the BDD (Docket No. 14, p. 467 of 630). However, there is no indication that, aside from the night splints, Plaintiff was being treated for carpal tunnel syndrome (Docket No. 14, pp. 354-630 of 630). Treatment notes from visits with Dr. Adams from 2009 through 2011 occasionally make note of Plaintiff's alleged carpal tunnel syndrome, but do not state that Plaintiff is receiving, or even requires, any further treatment (Docket No. 14, pp. 466, 469, 472, 474, 563, 566, 569, 571 of 630).

With regard to her cervical and lumbar pain, Plaintiff was diagnosed with cervical radiculopathy and a herniated disc at her C5-6 vertebrae on October 26, 2011 (Docket No. 14, p. 626 of 630). An examination revealed only some limitation of her cervical spine motion, minimal atrophy of her right side, and some sensory changes involving her C6 vertebrae (Docket No. 14, p. 625 of 630). Plaintiff consistently had full overhead motion and strength (Docket No. 14, pp. 597, 598, 625 of 630). Therefore, Dr. Gonzalez only recommended Plaintiff undergo conservative treatment with cervical traction and physical therapy (Docket No. 14, p. 626 of 630).

Finally, Plaintiff is being treated for depression (Docket No. 14, pp. 354-630 of 630). The medical records indicate that Plaintiff has suffered with some degree of mental health issues since August 22, 1992 (Docket No. 14, pp. 369, 373, 377, 381 of 630). She was diagnosed with an

adjustment disorder with a depressed mood and polysubstance abuse in full remission on October 11, 2006, during a Diagnostic Assessment (Docket No. 14, p. 364 of 630). At that time, Plaintiff was assigned a GAF score of seventy (Docket No. 14, p. 364 of 630). During a psychological evaluation on February 17, 2011, Dr. Smith diagnosed Plaintiff with depressive disorder NOS, personality disorder NOS, and assigned her a GAF score of fifty, indicating serious symptoms (Docket No. 14, pp. 523-24 of 630). However, Dr. Smith found that Plaintiff was only *moderately* impaired in her ability to: (1) relate to others; (2) maintain attention, concentration, and persistence; and (3) withstand the stress and pressure of day to day work (Docket No. 14, p. 524 of 630). Furthermore, Plaintiff showed no impairment in her ability to understand, remember, and follow instructions (Docket No. 14, p. 524 of 630). However, during a February 21, 2011, appointment with Dr. Adams, Plaintiff stated that she was not taking her Wellbutrin (Docket No. 14, p. 563 of 630). Furthermore, during an August 8, 2011, assessment at the Nord Center, Plaintiff indicated that she was only seeking mental health treatment because she thought it would get her SSI benefits (Docket No. 14, p. 605 of 630). As the ALJ noted, this secondary gain casts serious doubt as to Plaintiff's credibility (Docket No. 14, p. 18 of 630).

When viewed as a whole, it is clear that Plaintiff suffers from some degree of muscle and back pain, carpal tunnel syndrome, and depression. This is why ALJ Andreas limited Plaintiff to light work and then *further* limited her capabilities through additional restrictions (Docket No. 14, p. 17 of 630). Plaintiff's ailments simply do not rise to the level of severity required by Social Security regulations. Therefore, this Magistrate recommends the decision of the ALJ be affirmed.

### 2.    ADDITIONAL EVIDENCE

Plaintiff next seeks to introduce evidence that was not before the ALJ, namely, a letter from Dr. Adams, dated March 3, 2012, opining that Plaintiff could not be gainfully employed (Docket No. 14,

pp. 629-30; Docket No. 16, Attachment 3, pp. 1-2 of 3). Defendant argues that since this letter was not before the ALJ, it is ineligible for consideration by this Court (Docket No. 19, pp. 12-18 of 18).

Under 42 U.S.C. § 405(g), the court "shall have the power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." (emphasis added). This record, by definition, may only include material considered by the ALJ in rendering his final decision. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007). "When a plaintiff submits evidence that has not been presented to the ALJ, the court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g)." *Mendendorp v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 40019, *16 (W.D. Mich. Jan. 30, 2012).

Given the clarity of the statutory and case law, this Court is prohibited from rendering a decision or granting a motion based on any evidence not previously considered by the ALJ. Because Dr. Adams' March 2012 letter was not previously before ALJ Andreas, Plaintiff is prohibited from using it now to supplement the established record. The issue of whether or not this letter *should* be considered by the ALJ may only be addressed through a motion for a sentence six remand under 42 U.S.C. § 405(g). Sentence six states:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in

24

> which the Commissioner has not made a decision fully favorable to the
> individual, a transcript of the additional record and testimony upon which
> the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g). Each requirement of sentence six will be discussed below.

### a.    NEW AND MATERIAL EVIDENCE

In order to show that evidence is *new*, Plaintiff must show that the evidence "was not in existence or available to the claimant at the time of the administrative proceeding." *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483-84 (6th Cir. 2006) (*quoting Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). Here, Plaintiff's 2012 letter from Dr. Adams simply does not fit this definition. The content of Dr. Adams' letter is a mere summary of what Dr. Adams had essentially been saying for years: Plaintiff has fibromyalgia, lumbar and cervical spine disease, sleep apnea, and depression (Docket No. 14, p. 629 of 630; Docket No. 16, Attachment 3, p. 1 of 3). Dr. Adams made these findings on multiple occasions prior to March 2012 (Docket No. 14, pp. 466-68, 470, 472, 563, 567, 569 of 630). Plaintiff could have obtained this summary letter at any time prior to her administrative hearing.

Dr. Adams' letter is also not material. In order to be material, the proposed evidence must show that "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Hollon*, 447 F.3d at 483-84 (*quoting Foster*, 279 F.3d at 357). Here, Dr. Adams opined that Plaintiff "is unable to function in a meaningful way or be gainfully employed because of her significant and emotional problems. Her pain, muscle and joint stiffness render her unable to perform most physical tasks that would be required and her emotional state affects her ability to focus and stay on track" (Docket No. 14, p. 630 of 630; Docket No. 16, Attachment 3, p. 2 of 30).

To begin, the determination of disability is strictly a legal, not a medical, issue, and is reserved solely to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, Dr. Adams' opinion as to whether Plaintiff can or cannot work is irrelevant to the ALJ. Even if this opinion *were* relevant, it is not consistent with the balance of Plaintiff's medical record. As stated above, there is no indication that Dr. Adams performed the required trigger point test necessary for a diagnosis of fibromyalgia (Docket No. 14, pp. 354-630 of 630). Plaintiff's cervical and lumbar difficulties were somewhat mild and being treated through conservative means (Docket No. 14, pp. 625-26 of 630). The extent of Plaintiff's depression is somewhat in doubt, given her statement to Nord Center staff that she was only seeking counseling because she felt it would assist her in obtaining SSI benefits (Docket No. 14, p. 605 of 630). Furthermore, during Plaintiff's most recent psychological evaluation, Dr. Smith found Plaintiff to be only moderately impaired in her ability to relate to others, maintain attention, concentration, and pace, and withstand the stress and pressure of everyday work (Docket No. 14, p. 524 of 630). Given this existing evidence, Dr. Adams' March 2012 letter simply does not create a reasonable probability that the Commissioner would reach a different disposition of this case. Therefore, Plaintiff's letter from Dr. Adams fails to satisfy the first criteria required of a sentence six remand.

### b.    GOOD CAUSE

A claimant shows good cause by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Hollon*, 447 F.3d at 485 (*quoting Foster*, 279 F.3d at 357). Plaintiff fails to show *any* cause, let alone good cause, for her failure to "acquire and present" Dr. Adams' letter to the ALJ. Plaintiff has failed to meet the third requirement

necessary for a sentence six remand. Therefore, this Magistrate recommends that Plaintiff's request to remand her case based on the March 2012 letter from Dr. Adams be denied and the decision of the ALJ affirmed.

## VIII. Conclusion

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   March 8, 2013

## IX. Notice

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the Local Rules for Northern District of Ohio, any party may object to the report and recommendations within fourteen (14) days after being served with

a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.